# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07-20026-STA** |
| | ) | |
| **BILLY JOHNSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT OR ALTERNATIVELY FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 29

Before the Court is Defendant Billy Johnson's Motion for Judgment of Acquittal Notwithstanding the Verdict or Alternatively for a New Trial Pursuant to Fed. R. Crim. P. 29 (D.E. # 120) filed on June 18, 2009.  The government responded in opposition to the Motion on July 16, 2009.  On April 15, 2009, a jury convicted Defendant Billy Johnson of all eleven counts against him: one count of conspiracy to commit murder-for-hire pursuant to 18 U.S.C. § 1958(a); two counts of murder-for-hire pursuant to 18 U.S.C. §§ 1958(a) and 2; and eight counts of perjury pursuant to 18 U.S.C. § 1623.[1]  For the reasons set forth below, the Motion is **DENIED**.

---

[1] Superseding Indictment, Aug. 14, 2008.

## BACKGROUND

The testimony at trial established that in 1998 and 1999, Defendant wanted to develop a farm owned by his mother Martha Johnson into a subdivision and sell off tracts of the land.[2] Martha Johnson did not agree and insisted on continuing to farm the land. Witnesses observed Defendant and Martha Johnson having several vocal disagreements about plans for the land. One such witness Billy Archer testified at trial that he overheard some of these arguments between Defendant and Martha Johnson.

The evidence at trial also established that after Martha Johnson's repeated refusals to agree to her sons plans, Defendant began scheming to kill her and take control of her land and other assets. In the fall of 1998, Defendant offered Lee Allen Thomas ("Thomas"), a worker on Martha Johnson's farm, $10,000 to commit the murder. Thomas testified that he was cutting corn with Defendant when Defendant made the proposal. According to Thomas, Defendant offered to pay a portion of the money up front and the remainder after the murder had been committed. Thomas refused Defendant's offer. Approximately one month later, Thomas and Defendant were stringing fence on the farm. Defendant asked Thomas whether he had given any more thought to murdering Martha Johnson. Thomas replied that he had not. Thomas also testified that he later reported Defendant's offers to law enforcement. Ronnie Coleman, a Deputy United States Marshal, was an investigator with the Tipton County Sheriffs Department in 1998 when Thomas made a report prior to the murder of Martha Johnson. Coleman testified

---

[2] Defendant did not recount the trial testimony in his Motion; whereas, the government did in its response. The government's response brief cites to the specific portion of the trial transcript for support. Therefore, the Court will accept the government's statement of the trial testimony unless otherwise noted.

that "Mr. Thomas informed me that he had been approached by a Billy Johnson and offered a sum of money to kill his mother Martha Johnson."

The evidence showed that after Thomas rejected the Defendant's requests, Defendant approached Jeremy Lawrence ("Lawrence"), another worker on Martha Johnson's farm.  At trial, Lawrence testified that he was a friend of the Defendant.  According to Lawrence, Defendant and Lawrence were riding in Defendant's pickup truck one day when Defendant offered Lawrence money to commit a murder.  Lawrence asked Defendant whom Defendant had in mind.  Defendant told Lawrence that "he would show me a picture of it, of the person." Lawrence testified that he knew that Defendant kept only two photographs in the truck: one of Defendant's daughter Blaire, which was under the dash; and the other of Martha Johnson, which was above the sun visor.  Lawrence refused Defendant's offer.

Then in July 1999, Defendant approached Danny Winberry at a local bar and asked him whether he thought he could kill somebody for money.  At trial, Winberry testified that he had replied that "it depended on how much money and who it was, you know."  According to Winberry, Defendant then asked, "If you was going to kill somebody, how much would you charge?"  Winberry stated that he told the Defendant, "Taking the chance of losing your freedom the rest of your life, I don't know, probably $50,000.  That would probably be the cheapest I would even think about it."  After Winberry named this figure, Defendant revealed that he wanted Winberry to murder Martha Johnson.  Winberry testified that Defendant told him that his mother had been diagnosed with cancer and that he did not want her to suffer.

From that point Defendant and Winberry began to develop a plan to murder Martha Johnson. Telephone records introduced at trial confirmed that Defendant and Winberry spoke on

3

the telephone several times over the next two weeks.  According to Winberry, the two men agreed to meet at the Wal-Mart parking lot in Covington, Tennessee.  At the meeting, Defendant patted down Winberry in order to determine whether Winberry was wearing a wire.  Defendant then gave Winberry $5,000 in cash as a down payment and told Winberry that he would receive the remaining $45,000 after Winberry committed the murder and Defendant collected the life insurance money.  Defendant also gave Winberry a key to Martha Johnson's trailer.

The evidence showed that Defendant had called Winberry from a payphone on the Monday evening before the murder.  Winberry testified that in that telephone conversation, Defendant informed Winberry that he would be leaving town the following day for Arkansas. Defendant told Winberry that he wanted Winberry to murder Martha Johnson while Defendant was away on this trip.  Defendant hoped to establish an alibi for the time of the murder. Defendant added that Martha Johnson would be in Lauderdale County cutting hay that day and would return to her home at around 5:00 p.m. or 6:00 p.m.  Following this conversation, Defendant traveled with family and friends across state lines to Hot Springs, Arkansas.

On July 21, 1999, Winberry drove his red Nissan pickup with a gray stripe and parked near Martha Johnson's trailer.  Several witnesses observed Winberry's truck.  However, Winberry decided not to act that day and returned home.  Winberry returned on July 22 in the early afternoon and parked his truck in the same location.  Winberry then walked down the road to Martha Johnson's trailer.  After making sure that no one was watching, Winberry ran to the door, used the key to gain entry to the trailer, and waited inside for Martha Johnson to return home.

At approximately 5:15 p.m., Billy Archer and another farm worker dropped Martha

4

Johnson off in front of her trailer.  Upon her entering the trailer, Martha Johnson was met at gunpoint by Winberry.  Martha Johnson pleaded with Winberry, "Don't hurt me, don't hurt me, please don't hurt me."  Instead of shooting her, Winberry picked up an antique iron and bludgeoned Martha Johnson to death.  In order to destroy the crime scene and eliminate any forensic evidence, Winberry placed a kerosene lamp on the stove and turned the stove on, hoping that the stove top would break the glass of the kerosene lamp and set fire to the trailer.  Winberry then left the trailer without locking the front door.

Winberry testified that he returned home, changed and washed his clothes, and then told his girlfriend Rebecca Haynes ("Haynes") that he needed to go out.  That evening, Winberry told Haynes that he needed to be seen in public and that they should go out.  Winberry and Haynes went to several bars and returned home after midnight.  Haynes testified that Winberry was nervous and that at one point during the night, Winberry asked Haynes whether a kerosene lamp placed on a stove would cause a fire.  Haynes responded that she did not know.

In the early morning hours of July 23, 1999, as Haynes was going to bed, Winberry once again left his residence, taking a lighter and a rag with him.  He returned to Martha Johnson's trailer and discovered that the stove had not ignited the kerosene lamp or caused the fire he had intended to destroy the crime scene.  Winberry testified that he used an accelerant to set a fire in the bedroom of the trailer before he fled the scene and returned home.  By approximately 5:00 a.m., the trailer was ablaze.  Residents of the nearby trailer park owned by Martha Johnson awoke and notified the fire department.  By the time the fire department responded, the trailer was completely engulfed in flames.  Upon extinguishing the fire, firefighters discovered Martha Johnson's body in the bedroom.  Because of the damage to the body in the fire, authorities had

5

an autopsy performed in order to determine the cause of death.  The autopsy revealed that Martha Johnson had died from blunt force trauma.  The Tipton County Sheriffs Department under Capt. John Fletcher, the Tennessee Bureau of Investigation, and the State Bomb and Arson Squad returned to the scene to begin a murder investigation.

Initially, investigators had few leads until Rebecca Haynes came forward.  At trial Haynes stated that shortly before the murder of Martha Johnson, Winberry began receiving calls from a white male who would not identify himself.  According to Haynes, the male called Winberry's residence on several occasions and asked for Winberry.  If Haynes informed the caller that Winberry was not there, the caller would simply hang up.  Haynes testified that when the male caller did speak to Winberry, the conversation was brief, and afterwards Winberry would leave quickly.  According to Haynes, Winberry told her that "the guy that was calling had a big job for him to do."

At trial Haynes testified as to Winberry's unusual behavior on the night of the murder, specifically, how he came home in the early evening, how he stated that "he had to be seen," and how he left the residence after midnight carrying a lighter and a dish cloth.  Haynes also testified that she first learned of the murder of Martha Johnson and the fire at the trailer several days after the murder was committed.  Haynes immediately suspected Winberry and confronted him. Winberry denied any involvement and told Haynes that he had been paid to burn down a store. When Haynes demanded that Winberry take her to the store that he had burned, Winberry refused and threatened to kill her.  Winberry later confessed to Haynes that Defendant "had something to do with it."

Winberry testified that he also confessed the crime to Ricky Elrod ("Elrod"), his close

6

friend.  Elrod had sold Winberry a pistol shortly before the murder of Martha Johnson and later became suspicious of Winberry.  After Elrod confronted him, Winberry admitted that Defendant had hired him to murder Martha Johnson and that he had in fact committed the murder as Defendant requested.

Other witnesses also cooperated in the investigation of the murder of Martha Johnson.  Two residents of the trailer park located near Martha Johnson's trailer, Lisa Barnes ("Barnes") and Amanda Taylor, reported to Capt. Fletcher that they had seen a suspicious truck parked near Martha Johnson's trailer.  Both described the truck as a small red pickup with chrome bars on the bed and gray stripes.  This was an accurate description of Danny Winberry's pickup truck.

Barnes testified that several days after talking to Capt. Fletcher, she was paying her rent to Defendant.  Defendant had assumed control of Martha Johnson's assets in the wake of her death.  Barnes wanted the Defendant to know that she was assisting in efforts to identify the person who had murdered Martha Johnson.  Barnes specifically told Defendant that she had described the suspicious red pickup to Capt. Fletcher.  To Barnes' surprise, Defendant told her that "it would be best if I didn't go back and tell him anything else," and "not to go back or don't say anything when I went back."  Barnes testified that Defendant's comments left her "in shock."

When investigators identified Winberry as a suspect in the murder of Martha Johnson, they questioned Barnes again and showed her a photo spread of various red pickup trucks including a photograph of Winberry's truck.  At trial, Barnes testified that as a result of her conversation with Defendant, she made various vague statements to investigators and did not identify Winberry's truck in the photo spread.  Several years later, however, when the investigation into the murder of Martha Johnson was renewed, Barnes was re-interviewed.  At

that time, she identified a photograph of Winberry's truck as the same vehicle she had seen down the road from Martha Johnson's trailer on the day of the murder.

The investigation of Martha Johnson's murder continued for several years. Meanwhile, Defendant took control of Martha Johnson's assets and began to profit from her death. A local attorney J. Thomas Caldwell ("Caldwell") testified that Defendant was unable to locate an executed will. Defendant was thus forced to file Martha Johnson's estate as intestate. That meant that Defendant, Jerry Edwards (Defendant's brother), and Hunter Edwards (Martha Johnson's seventeen-year old orphaned grandson) were each entitled to a one-third interest in the estate of Martha Johnson. Defendant was appointed administrator of the estate. Caldwell testified that an administrator has a fiduciary duty to anyone who has an interest in an estate. Taking into account the real estate, Defendant knew that the estate of Martha Johnson had a positive net worth of hundreds of thousands of dollars. Nevertheless, Defendant kept this information from his brother and nephew and led them to believe that the estate was worthless. Jerry Edwards submitted a waiver of any claims to the estate but later admitted at trial that if he had known the true value of the estate, he would not have signed the disclaimer. In a direct breach of his fiduciary duty, Defendant obtained a waiver from his minor nephew Hunter Edwards who signed the waiver at the behest of the Defendant without the presence of a guardian, without being told that he had inherited a portion of Martha Johnson's estate, and without being told that the estate was very valuable. Having obtained waivers from the other intestate heirs, Defendant was able to inherit the entire estate of Martha Johnson.

At trial, the government offered proof that after Defendant had secured control over Martha Johnson's estate, Defendant began to sell tracts of the farm land. James Burlison

("Burlison"), the adjacent land owner, offered to purchase portions of the farm from Defendant at above-market rates in order to keep it from being developed.  Over the next several years, Defendant sold several more tracts of land to Burlison. Additionally, Defendant received $102,000 in life insurance proceeds.  The life insurance checks were sent to Defendant at an address in Tipton County, Tennessee, from an office of the life insurance company in Florida via the Econocheck Corporation in Stockbridge, Georgia.  Jonathan Esworthy, a forensic auditor with the Bureau of Alcohol, Tobacco, and Firearms, testified at trial that the total proceeds obtained by Defendant from the sale of Martha Johnson's estate was $1,124,962.56.  Esworthy also testified that Defendant obtained a net profit of approximately $611,893.56 from the death of Martha Johnson.

Finally, Defendant appeared before a federal grand jury in 2004.  At that time, Defendant testified that he was in Hot Springs, Arkansas, at the time of the murder.  Defendant denied that he had attempted to recruit Lee Allen Thomas or Jeremy Lawrence to murder his mother. Defendant further denied that he had told Lisa Barnes not to cooperate with Capt. Fletcher or to talk to anybody about the red truck.  Upon taking the stand, Defendant offered similar testimony at trial, all of which was directly contradicted by the Government's case-in-chief.

Defendant was initially indicted on January 23, 2007, and a superseding indictment was returned on August 14, 2008.  Defendant was charged with one count of conspiracy to commit murder-for-hire pursuant to 18 U.S.C. § 1958(a); two counts of murder-for-hire pursuant to 18 U.S.C. §§ 1958(a) and 2; and eight counts of perjury pursuant to 18 U.S.C. § 1623.  Following a thirteen-day jury trial, Defendant was convicted of all counts.

Defendant filed the instant Motion after the jury verdict pursuant to Fed. R. Crim. P. 29,

which provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion within 7 days after a guilty verdict. . . ."[3]


## STANDARD OF REVIEW

"The test for denial of a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is the same as the test for reviewing a claim that the evidence is insufficient to support a conviction."[4]  In reviewing claims for sufficiency of the evidence to support a conviction, the Court should review the record in the light most favorable to the prosecution and grant relief only if it is found that upon the evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.[5]  The government must receive the benefit of all inferences which can reasonably be drawn from the evidence.[6]  Under the Rule 29 standard, "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."[7]  At the same time, a

---

[3] Fed. R. Crim. P. 29(c)(1).  The Court notes that absent contrary Congressional action, paragraph (c) of Rule 29 will be amended to permit a defendant 14 days in which to file a motion for new trial effective December 1, 2009.

[4] *United States v. Pennyman,* 889 F.2d 104, 106 (6th Cir. 1989).

[5] *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-92, 61 L.Ed.2d 560 (1979); *see also United States v. Acosta-Cazares,* 878 F.2d 945, 954-52 (6th Cir.), *cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989).

[6] *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

[7] *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994); *United States v. Prieur,* 429 F.2d 1237, 1238 (6th Cir. 1970).

defendant's contradictory evidence is not to be considered on a motion for a directed verdict.[8] The Sixth Circuit has stated that a defendant claiming "insufficiency of the evidence bears a very heavy burden."[9]  In deciding a motion for judgment of acquittal, the district court may not make its own determinations with respect to the credibility of witnesses or the weight to be given such evidence.[10]

## ANALYSIS

Defendant has moved for a judgment of acquittal or new trial on the basis of eleven assignments of error.  The Court will consider each assignment of error separately in its analysis. As an initial matter, the Court notes that Defendant's Motion seeks a judgment of acquittal or in the alternative a new trial.  Rule 29 permits the Court to grant a new trial only after it enters a judgment of acquittal after a guilty verdict and then only conditionally.[11]  Therefore, the Court will analyze Defendant's motion pursuant to Rule 29.

---

[8] *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir. 1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985); *Robinson v. U.S.,* 144 F.2d 392, 401 (6th Cir. 1944), *aff'd on other grounds,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945).

[9] *Abner*, 35 F.3d at 253; *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.) (citations omitted), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

[10] *United States v. Levy,* 904 F.2d 1026, 1032 (6th Cir. 1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991).

[11] Fed. R. Crim. P. 29(d)(1).

## I.    *Count One of the Indictment*

In his first assignment of error, Defendant argues that the Court erred in denying his motion to dismiss Count One pursuant to Fed. R. Crim. P. 12(b)(3)(B).  Defendant relies on the arguments presented in his previous motion and has not presented any additional authority in support of his position that Count One fails to allege an offense against him.  According to Defendant's previous motion, an overt act is an essential element of conspiracy to commit murder-for-hire under 18 U.S.C. § 1958(a).  However, the indictment in this case fails to allege an overt act.  Defendant further contends that the evidence adduced at trial was insufficient to sustain a conviction on this count.  The government has responded with the same arguments offered in response to Defendant's initial motion to dismiss Count One.  The government contends that the statute in question does not list commission of an overt act as a required element of the offense.

With respect to Defendant's renewed motion to dismiss Count One, the Court holds that it finds no error in its previous Order Denying Defendant's Motion to Dismiss Count One entered on May 4, 2009.  The Court held then that Count One of the indictment properly stated the elements of the offense of conspiracy to commit murder-for-hire pursuant to 18 U.S.C. § 1958(a).  The Sixth Circuit has held generally that "when a statute does not require an overt act, we do not read that requirement into the statute."[12]  The Supreme Court of the United States has consistently applied the same principle to many conspiracy statutes through almost a century of

---

[12] *United States v. Dedman*, 527 F.3d 577, 594 (6th Cir. 2008) (citing *Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)).

its jurisprudence.[13]  The Supreme Court has summarized the overt act requirement in this way: "[Earlier cases] give Congress a formulary: by choosing a text modeled on § 371 [the general conspiracy statute], it gets an overt-act requirement; by choosing a text modeled on the Sherman Act, 15 U.S.C. § 1 [which . . . omits any express overt-act requirement], it dispenses with such a requirement."[14]

The Court concluded that this same reasoning should apply to 18 U.S.C. § 1958(a).  The federal murder-for-hire statute found at 18 U.S.C. § 1958(a) does not mention proof of an overt act as a required element of the crime and otherwise omits the "any act to effect the object of the conspiracy" language of 18 U.S.C. § 371, the general conspiracy statute.  In light of this omission, the Court held that Congress had "dispense[d] with such a requirement" as to the federal conspiracy to commit murder-for-hire statute.  As a result, the Court determined that proof of an overt act is not an element of the crime of conspiracy to commit murder-for-hire pursuant to 18 U.S.C. § 1958(a).  Defendant has failed to cite to any specific error in the Court's previous Order and the Court finds no reason to disturb its ruling.  Therefore, Defendant's Motion is denied as to this issue.

As for his conviction on Count One, Defendant has argued that the evidence adduced at trial was insufficient to sustain a conviction.  The murder-for-hire statute makes it a crime to travel[] in or cause[] another (including the intended victim) to travel in interstate or foreign commerce, or use or cause[] another (including the intended victim) to use the

---

[13] *E.g. Nash v. United States,* 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913) (Sherman Act); *Singer v. United States,* 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285 (1945) (Selective Service and Training Act of 1940).

[14] *Whitfield v. United States*, 543 U.S. 209, 125 S.Ct. 687 (2005) (quoting *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382 (1994)).  *Whitfield*  held that an overt act was not an element of the federal money laundering conspiracy statute, 18 U.S.C. § 1956(h).  *Shabani* held that an overt act was not an element of the drug conspiracy statute, 21 U.S.C. § 846.

mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or ... conspire[] to do so.[15]

To prove a conspiracy in violation of 18 U.S.C. § 1958(a), the government must establish that (1) that two or more persons conspired, or agreed, to commit the crime of murder-for-hire in violation of federal law; and (2) that a defendant knowingly and voluntarily joined the conspiracy.

The evidence at trial showed that in July 1999, Defendant approached Winberry and inquired about Winberry's willingness to commit murder in exchange for a sum of money. Winberry responded that he would commit murder but for no less than the sum of $50,000. Defendant then told Winberry that he wanted Winberry to murder Defendant's mother, Martha Johnson. Winberry testified that Defendant told him that his mother had been diagnosed with cancer and that he did not want her to suffer.

The government offered telephone records to show that following their initial discussion, Defendant and Winberry continued to speak on the telephone during the next two weeks. Winberry testified that he and Defendant agreed to meet at a Wal-Mart parking lot in Covington, Tennessee. After patting Winberry down to check for a listening device, Defendant gave Winberry $5,000 in cash as a down payment and told Winberry that he would receive the remaining $45,000 after the murder had been committed and the insurance money had been collected. Defendant also gave Winberry a key to Martha Johnson's trailer.

_____

[15] 18 U.S.C.A. § 1958(a).

14

The proof at trial showed that on the Monday evening before the murder, Defendant contacted Winberry from a payphone and informed Winberry that he would be leaving town for Arkansas on the following day.  Defendant also told Winberry that he wanted Winberry to murder Martha Johnson while Defendant was away on this trip.  Defendant added that Martha Johnson would be in Lauderdale County cutting hay that day and would return to her home at around 5:00 p.m. or 6:00 p.m.  Defendant did in fact travel with his family and some friends across state lines to Hot Springs, Arkansas.

On July 21, 1999, Winberry drove his red Nissan pickup and parked near Martha Johnson's trailer where it was observed by several people including Lisa Barnes, a resident of the trailer park located near Martha Johnson's trailer.  After Martha Johnson's murder, Barnes reported the incident and described the truck to the Tipton County Sheriffs Department.  Defendant later attempted to discourage Barnes from cooperating in the investigation of his mother's murder, which left Barnes "in shock."

The evidence showed that Winberry returned to the trailer and murdered Martha Johnson on July 22, 1999.  Winberry arrived in the early afternoon on July 22, parked his truck, and gained entry to Martha Johnson's trailer using the key provided by Defendant.  When Martha Johnson returned to her home that evening, Winberry was waiting for her.  Winberry held Martha Johnson at gunpoint, and the victim pleaded for her life.  Winberry picked up an antique iron and proceeded to bludgeon Martha Johnson to death.  Winberry made an unsuccessful attempt to destroy the crime scene and later returned over night to set fire to Martha Johnson's trailer.  The government offered proof that Winberry later confessed the murder as well as Defendant's involvement in the conspiracy, first to his girlfriend Rebecca Haynes and then to a

15

friend Ricky Elrod.  Haynes testified that in the days leading up to Martha Johnson's murder, a mysterious white male would call Winberry's residence.  Winberry told Haynes that "the guy that was calling had a big job for him to do."  Winberry later told Haynes that Defendant "had something to do with it."

After the murder was accomplished, Defendant took charge of his mother's property. The evidence showed that Defendant filed Martha Johnson's estate as intestate, entitling Defendant, Jerry Edwards (Defendant's brother), and Hunter Edwards (Martha Johnson's seventeen-year old orphaned grandson) to a one-third interest in Martha Johnson's estate.  As administrator of the estate, Defendant knew that the estate including the real estate had a net positive value.  Although the estate had a net worth of hundreds of thousands of dollars, Defendant deceived his brother and nephew and told them that the estate was worthless.  Upon Defendant's request, both Jerry Edwards and Hunter Edwards submitted waivers of any claims to the estate making Defendant the sole heir.  Once Defendant had control of the estate, Defendant sold several tracts of the farm to a neighbor.  Defendant also received proceeds from a life insurance policy on his mother.

Viewing this evidence in the light most favorable to the government, the Court holds that the evidence was sufficient to allow any rational juror to find the essential elements of Count One beyond a reasonable doubt.  The evidence showed that Defendant conspired with Danny Winberry to commit murder for hire, that is to use a facility of interstate commerce with the intent that a murder be committed in exchange for $50,000.  The evidence was also sufficient to show that Defendant voluntarily joined the conspiracy.  Therefore, Defendant's Motion is denied as to this issue.

## II.        *Count Three of the Indictment*

In his second assignment of error, Defendant argues that the Court erred in denying his motion to dismiss Count Three pursuant to Fed. R. Crim. P. 12(b)(3)(B).  Defendant again relies on the arguments presented in his previous motion and has not presented any additional authority in support of his position that Count Three fails to allege an offense against him.  According to Defendant's previous motion, the murder-for-hire count against him should be dismissed because the interstate activity alleged in this case occurred after the murder took place.  More specifically, the murder of Martha Johnson happened on July 22, 1999; whereas, American Bankers Insurance Company ("ABIC") mailed two checks totaling $102,000 to Defendant in November 1999. Defendant further contends that the evidence adduced at trial was insufficient to sustain a conviction on this count.  The government has responded with the same arguments offered in response to Defendant's initial motion to dismiss Count Three.  The government contends that the statute in question does not contain any temporal requirements.

With respect to Defendant's renewed motion to dismiss Count Three, the Court finds no error in its previous Order Denying Defendant's Motion to Dismiss Count Three.  The Court held then that Count Three of the indictment properly stated the elements of the offense of murder-for-hire.  Relying on the case of *United States v. Ransbottom*,[16] the Court held that § 1958 does not require that the elements of the offense occur in a specific temporal sequence. Because the murder itself is not an element of the crime, the Court reasoned that the fact that the murder of Martha Johnson occurred prior to the interstate activity alleged in Count Three of the indictment is irrelevant to prove the crime of murder-for-hire.  Furthermore, there is nothing in

---

[16] 914 F.2d 743 (6th Cir. 1990).

17

the plain wording of the statute to suggest that the interstate activity must be accomplished prior to the murder or proposed murder.[17]  The Court also cited the Sixth Circuit's liberal interpretation of the interstate activity requirement in *United States v. Winters*,[18] in which the Sixth Circuit held that the interstate activity need only "promote, advance, manage, carry on or facilitate" the actual murder-for-hire.  The Court noted that Defendant's scheme to pay Winberry was not complete until after the interstate activity occurred, that is, Defendant had received the proceeds of a life insurance policy on the victim, Martha Johnson.  Defendant has failed to cite any specific error in the Court's previous Order and the Court finds no reason to disturb its ruling.  Therefore, Defendant's Motion is denied as to this issue.

As for his conviction on Count Three, Defendant has argued that the evidence adduced at trial was insufficient to sustain a conviction.  To prove the crime of murder-for-hire in violation of 18 U.S.C. § 1958(a), the government must establish that (1) that the defendant traveled in interstate commerce, or used or caused another to use the mail or any facility of interstate commerce; (2) that the defendant did so with the intent that a murder be committed; and (3) as consideration for the receipt of, or as consideration for the promise or agreement to pay anything of pecuniary value.

The evidence in the case showed that in July 1999, Defendant approached Danny

---

[17] The Court contrasted the Travel Act's language that makes it a crime to "travel[] in interstate commerce with the intent [to commit proscribed acts]... and *thereafter* perform[] or attempt[] to perform [the proscribed acts].... " (emphasis added).  No such language is found in § 1958.  Order Denying Def.'s Mot. to Dismiss Count Three, May 28, 2009.

[18] 33 F.3d 720 (6th Cir. 1994) (upholding conviction under § 1958 where wife hired her brother to murder her estranged husband in consideration for $10,000 to be paid from life insurance benefits *after* husband's death).

Winberry and inquired about Winberry's willingness to commit murder in exchange for money. Winberry responded that he would commit murder but for no less than $50,000. Defendant then told Winberry that he wanted Winberry to murder Defendant's mother, Martha Johnson. Winberry testified that Defendant told him that his mother had been diagnosed with cancer, and that he did not want her to suffer. Subsequent to their initial discussion, Winberry and Defendant met at a Wal-Mart parking lot in Covington, Tennessee, where Defendant gave Winberry $5,000 in cash as a down payment and told Winberry that he would receive the remaining $45,000 after the murder had been committed and the insurance money had been collected. Defendant also gave Winberry a key to Martha Johnson's trailer. Upon his mother's death, the Defendant received $102,000 in life insurance proceeds. The life insurance checks were sent to Defendant at an address in Tipton County, Tennessee, from an office of the life insurance company in Florida, via the Econocheck Corporation in Stockbridge, Georgia.

Viewing this evidence in the light most favorable to the government, the Court holds that the evidence was sufficient to allow any rational juror to find the essential elements of Count Three beyond a reasonable doubt. The evidence showed that the defendant caused the life insurance company to use the mail to send him over $100,000 in life insurance proceeds. This was an essential part of Defendant's scheme that the murder of Martha Johnson be committed because Defendant agreed to pay Winberry $45,000 from those proceeds as consideration for the murder. Therefore, Defendant's Motion is denied as to this issue.

### III.     *Count Two of the Indictment*

19

In his third assignment of error, Defendant asks the Court for the first time to dismiss Count Two of the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B). Defendant argues that Count Two fails to state an offense because Defendant's travel to Arkansas did not make the commission of the murder-for-hire "easier." The government argues in opposition that Sixth Circuit precedent requires only that interstate activity further or facilitate a proscribed act. In this case, Defendant planned a trip to Arkansas and directed Winberry to commit the murder while Defendant was out of town with his family. Defendant's trip to Arkansas satisfied two objectives: it gave Defendant an alibi for the time of the murder, and it insured that Defendant's daughter was not at Martha Johnson's home at the time of the murder. Therefore, the travel to Arkansas furthered or facilitated the scheme.

The Sixth Circuit has held that an indictment is adequate if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."[19] It is well-settled that "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."[20] "An indictment is usually sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense."[21]

---

[19] *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Maney,* 226 F.3d 660, 663 (6th Cir. 2000); *United States v. Monus,* 128 F.3d 376, 388 (6th Cir. 1997).

[20] *U.S. v. Landham*, 251 F.3d 1072, 1079-1080 (6th Cir. 2001).

[21] *Id*. (citing *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887; *Monus,* 128 F.3d at 388).

20

The Court holds that Count Two of the indictment properly states the elements of the offense of murder-for-hire.  As discussed previously, the federal murder-for-hire statute found at 18 U.S.C. § 1958(a) makes it a crime to

> travel[] in or cause[] another (including the intended victim) to travel in interstate or foreign commerce, or use or cause[] another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or ... conspire[] to do so.[22]

The Sixth Circuit has broadly construed § 1958's interstate activity and held that one of the reasons for the activity need only "promote, advance, manage, carry on or facilitate" the murder-for-hire.[23]  In other words the Sixth Circuit has taken the view that the interstate activity need only make the murder-for-hire transaction possible.  In light of this liberal interpretation of the interstate activity element, it is clear that Defendant's travel to Arkansas promoted, advanced, and facilitated the alleged scheme.  The testimony at trial indicated that Defendant had coordinated the murder to coincide with his trip.  Defendant decided on the timing because his travel would give him an alibi for the actual murder as well as protect his daughter from the possibility that she might be at Martha Johnson's home at the time of the murder.  Thus, the travel was an essential element to Defendant's crime without which the crime would not have been committed at the time and place of Defendant's choosing.  The interstate activity alleged in

---

[22] 18 U.S.C. § 1958(a).

[23] *Winters*, 33 F.3d at 722.  The *Winters* court adopted the following jury instruction as a correct statement of the law concerning the interstate activity element of § 1958: "that defendants used or caused to be used the interstate facility and that one of the reasons for using the interstate facility was to *promote, advance, manage, carry on or facilitate*" (emphasis added) the murder-for-hire.  *Id.*

this case promoted, advanced, and facilitated the alleged scheme.  Therefore, Defendant's

Motion is denied as to this issue.

As for his conviction on Count Two, Defendant has argued that the evidence adduced at

trial was insufficient to sustain a conviction.  To prove the crime of murder-for-hire in violation

of 18 U.S.C. § 1958(a), the government had to establish that (1) that the defendant traveled in

interstate commerce, or used or caused another to use the mail or any facility of interstate

commerce; (2) that the defendant did so with the intent that a murder be committed; and (3) as

consideration for the receipt of, or as consideration for the promise or agreement to pay anything

of pecuniary value.

The Court has already reviewed the evidence which supported Defendant's conviction on

Counts One and Three.  The Court finds that much of the same evidence supports Defendant's

conviction on Count Two, particularly the third element of the crime.  The evidence showed that

Defendant had agreed to pay Winberry $50,000 in consideration for the murder of Martha

Johnson.  The only distinction between the crimes charged in Count Two and Count Three is the

interstate element itself.  In Count Three, the interstate element was the mailing of the life

insurance proceeds to Defendant after Martha Johnson's murder.  In Count Two, the interstate

element is Defendant's trip to Arkansas that coincided with the murder.  The proof at trial

showed that on the Monday evening before the murder, Defendant contacted Winberry from a

payphone and informed Winberry that he would be leaving town the following day and going to

Arkansas.  Defendant also told Winberry that he wanted Winberry to murder Martha Johnson

while Defendant was away on this trip.  Defendant added that Martha Johnson would be in

Lauderdale County cutting hay that day and would return to her home at around 5:00 p.m. or

6:00 p.m.  Defendant did in fact travel with his family and some friends across state lines to Hot Springs, Arkansas.  By doing so, Defendant hoped to establish an alibi for the time of the murder.  As Defendant had instructed him, Winberry committed the murder while Defendant was traveling out of town with his family to Arkansas.

Viewing this evidence as well as the other evidence discussed *supra* in the light most favorable to the government, the Court holds that the evidence was sufficient to allow any rational juror to find the essential elements of Count Two beyond a reasonable doubt.  The evidence showed that Defendant traveled from Tennessee to Arkansas with the intent that the murder of Martha Johnson be committed while he was away.  Furthermore, Winberry agreed to commit the murder while Defendant was in Arkansas for the sum of $50,000.  Therefore, Defendant's Motion is denied as to this issue.

### IV.    *Excluded Testimony of Lisa Uttz*

In his fourth assignment of error, Defendant argues that the Court erred by excluding the testimony of Lisa Uttz ("Uttz").  According to Defendant, Uttz's testimony would have gone to show Winberry's "signature burglary activity."  Uttz would have testified that Winberry burgled her home only five months before the murder of Martha Johnson while Uttz and her family were on vacation.  The testimony would have supported Defendant's theory that Winberry had broken into Martha Johnson's trailer to commit burglary at a time Winberry believed that Martha Johnson was away on a trip with Defendant.  According to Defendant's theory, when Martha Johnson returned home and discovered Winberry robbing her, Winberry murdered her in a "rage killing."  Thus, the Uttz testimony should have been admitted under Fed. R. Evid. 404(b) as

proof of Winberry's signature plan, scheme or modus operandi.

The government responds that the Court properly excluded the evidence under Fed. R. Evid. 608(b).  The Uttz testimony constituted extrinsic evidence in an attempt to impeach Winberry on a collateral matter.  Furthermore, Defendant has failed to show how the exclusion of this testimony prejudiced him where Defendant extensively cross-examined Winberry about the Uttz burglary.  On cross-examination Winberry never denied his involvement in the Uttz burglary.  Based on Winberry's testimony, Defendant was able to argue to the jury that the murder was the result of a robbery gone wrong.  Had the Court permitted Lisa Uttz's testimony, the government contends that Defendant would have opened a mini-trial on the Uttz burglary.  The government also disputes that the Uttz testimony would have had probative value under Rule 404(b) due to the fact that the Uttz burglary and Winberry's murder of Martha Johnson had little in common factually.  Thus, it was not error for the Court to exclude the testimony of Lisa Uttz.

The Court finds that there was no error in its ruling on the admissibility of the Uttz testimony.  As it did when it considered the government's motion *in limine* at trial, the Court holds that Fed. R. Evid. 608(b) governs the situation presented, not Fed. R. Evid. 404(b).  Rule 608(b) provides

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of

another witness as to which character the witness being cross-examined has testified.[24]

Rule 608(b) prohibits the introduction of extrinsic evidence regarding the credibility of a witness. At the same time, the Rule does permit cross-examination of the witness. As a result, defense counsel is "stuck with" the responses given on cross-examination and may not offer extrinsic evidence to attack the credibility of a witness.[25] In this case, Defendant cross-examined Winberry at length about the Uttz robbery and presented to the jury his theory that Winberry murdered Martha Johnson in a burglary-gone-wrong "rage killing." Nevertheless, Defendant argues that the Uttz testimony should have been allowed pursuant to Fed. R. Evid. 404(b), which permits evidence of "other crimes, wrongs, or acts" for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[26] Defendant contends that the Uttz testimony would have buttressed Defendant's theory that Winberry was attempting to rob Martha Johnson like he had robbed the Uttz residence.

The Court holds that Defendant's argument on this point fails and that the Court properly excluded the testimony of Lisa Uttz. The Sixth Circuit rejected a similar defense argument in a case where the district court excluded extrinsic evidence under Rule 608(b) concerning crimes committed by a government witness.[27] In *United States v. Jackson-Randolph*, the defense sought to introduce extrinsic evidence to attack the witness' credibility and argued that the witness was biased, i.e. that he fabricated his testimony against the defendant in order to avoid prosecution

---

[24] Fed. R. Evid. 608(b).

[25] *United States v. Frost*, 914 F.2d 756, 767 (6th Cir. 1990).

[26] Fed. R. Evid. 404(b)

[27] *United States v. Jackson-Randolph*, 282 F.3d 369, 383 (6th Cir. 2002).

for his own crimes.[28]  However, the Sixth Circuit held that the district court had not abused its

discretion in excluding the extrinsic evidence because the jury already had evidence of the

witness' involvement in the crime for which the defendant was being prosecuted and the defense

had the opportunity to cross-examine the witness on any apparent bias.[29]  Likewise, Winberry

admitted in his testimony that he had voluntarily joined the conspiracy with Defendant to

commit murder in exchange for $50,000 and that he had murdered Martha Johnson.  Thus, the

jury was well aware of Winberry's gruesome acts in connection with the crimes for which

Defendant was on trial.  Defendant further had the opportunity to question Winberry about his

involvement in the Uttz burglary and to develop his theory that Winberry had attempted to rob

Martha Johnson in a similar fashion.  The jury was also instructed to consider Winberry's

testimony with heightened scrutiny due to his agreement to cooperate with the government.  The

Court finds that Defendant had the opportunity to present to the jury evidence from which

Defendant could argue that Winberry acted alone in a burglary "gone bad."  Therefore, the Court

holds that it was not error to exclude the testimony of Lisa Uttz on these extrinsic matters under

Fed. R. Evid. 608(b).

Even if the Court had analyzed the issue under Fed. R. Evid. 404(b), the Court finds that

Defendant has failed to make the threshold showing necessary for admissibility, that is, the

relevance of the Uttz testimony under Rule 401.  The proffered testimony did not tend "to make

the existence of any fact that [was] of consequence to the action more probable or less probable

---

[28] *Id.*

[29] *Id.*

than it would [have been] without the evidence."[30]  Winberry testified on cross-examination that

his friend Rick Elrod was going to be on vacation with the Uttz family and that Mr. Uttz kept a

large sum of cash in the house.  In her proffered testimony, Mrs. Uttz stated that the burglar had

kicked in the back door to gain entry and later slashed upholstered furniture during the burglary.

From these premises, Defendant argues that the Uttz burglary would go to show Winberry's plan

and intent and support the theory that Winberry's "signature crime" was robbing homes while

the occupants were away.  This evidence would also tend to show that when Winberry did not

find a treasure trove in the burgled home, he erupted in a rage, slashing the Uttzes' sofa in one

instance and brutally murdering Martha Johnson in the other.

The Court finds that the two incidents are so factually dissimilar, however, that the

burglary of the Uttz residence is irrelevant under Rule 401.  The Uttz break-in is the only other

burglary that Defendant questioned Winberry about or sought to introduce with extrinsic

evidence.  First, Winberry testified that he burgled the Uttz residence because he knew that the

Uttz family was on vacation.  However, the evidence at trial showed that Defendant had

informed Winberry that Martha Johnson would be home and when she would be home.  Second,

Winberry forcibly entered the Uttz home; whereas, there was no evidence of forced entry to

Martha Johnson's trailer.  In fact, evidence at trial showed that Defendant provided Winberry

with a key to the trailer.  Finally, the fact that Winberry allegedly destroyed a piece of

upholstered furniture during the Uttz burglary does nothing to tend to show that Winberry would

bludgeon a human being to death during the commission of a burglary.  Thus, the Court

concludes that the facts of the Uttz burglary have no probative value in this case.

---

[30] Fed. R. Evid. 401.  *See also United States v. Peters*, 15 F.3d 540, 545 (6th Cir. 1994).

Even if relevant, the Court holds that the Uttz testimony was properly excluded.  If anything, Defendant's attempt to introduce the Uttz testimony as evidence of a "signature crime" was arguably "to prove the character of the person in order to show action in conformity therewith."  This type of evidence is strictly inadmissible pursuant to Rule 404(b).  Additionally, any probative value of the Uttz testimony would have been substantially outweighed by the danger of confusion of the issues and misleading the jury.  Thus, it was properly excluded under Rule 403 as well.  Therefore, the Court holds that there was no error in its decision to exclude the testimony of Lisa Uttz.

Finally, the Sixth Circuit has concluded that even when a court abuses its discretion by excluding extrinsic evidence, the error is harmless where the defendant has the opportunity to cross-examine the witness about the extrinsic matters.[31]  Such error is also harmless where there was sufficient evidence from other sources of the defendant's crime to convict even if the excluded evidence could have undermined the witness' credibility.[32]  As previously discussed, Defendant had the opportunity to cross-examine Winberry on the Uttz burglary and develop his theory that Winberry acted alone in the murder of Martha Johnson.  And even if the jury had concluded that Winberry's testimony was not credible, there was additional corroborating evidence that Defendant had contacted Winberry by telephone to discuss the conspiracy and that Winberry had identified Defendant as his co-conspirator soon after the murder of Martha Johnson.  There was additional testimony that Defendant had discouraged another witness from

---

[31] *Jackson-Randolph*, 282 F.3d at 383*; United States v. Logan*, 187 F.3d 639, *5 (6th Cir. 1999).

[32] *Jackson-Randolph*, 282 F.3d at 383.

28

cooperating with authorities.  Defendant had also deceived his own brother and nephew in order to gain the entire estate of Martha Johnson for himself.  The Court finds that there was ample evidence to corroborate Defendant's participation in the conspiracy besides Winberry's testimony.  Therefore, the error, if any, in excluding the Uttz testimony was harmless.

Having rejected Defendant's argument that the Court erred in excluding the testimony of Lisa Uttz pursuant to Fed. R. Evid. 608(b), Defendant's Motion is denied as to this assignment of error.

### V.      *Testimony of Ronnie Coleman*

In his fifth assignment of error, Defendant argues that the Court erred by allowing the testimony of Ronnie Coleman, formerly of the Tipton County Sheriffs Department.  Coleman was the investigator to whom Lee Thomas reported that Defendant had asked Thomas to kill Martha Johnson.  According to Defendant, Coleman's testimony was based on notes taken by Capt. John Fletcher, not Coleman.  Defendant further contends that Coleman was not disclosed as a government witness prior to his testimony at trial nor was Defendant provided with the contents of Coleman's statement prior to Coleman's taking the stand.  Defendant argues that on cross-examination, Coleman admitted that there was no subsequent investigation into Thomas' allegations, that Coleman did not have any additional information at the time he left the sheriffs department in 2000, and that Coleman believed that he had made a tape of Thomas's remarks but had not attempted to locate it.  Defendant concludes by arguing that Coleman's testimony was prejudicial and "[t]he defense is certain that this inflammatory information was the tipping point for the jury."  For these reasons Coleman should not have been allowed to testify.

The government has responded that there was no error in permitting Coleman to testify. As to Defendant's contention that Coleman testified from notes taken by another officer, Coleman stated that he had personal recollection of Thomas's allegations about Defendant. As the Court held at trial, a witness may refresh his or her recollection by referring to notes in advance of his testimony. Coleman's only testimony concerning notes was that he referred to Capt. Fletcher's notes to determine the date of his interview with Thomas. The government argues that as far as disclosing Coleman as a witness, there is no authority for the proposition that the government must disclose all of its witnesses or the substance of their testimony prior to trial. In fact, Defendant admitted during the trial that the government had produced the notes of Capt. Fletcher prior to calling Coleman to the stand. As for Defendant's other arguments concerning the inadequacy of Coleman's investigation, the government contends that Defendant elicited all of these facts on cross-examination. Thus, the jury had the opportunity to consider these facts as it weighed Coleman's credibility.

The Court holds that there was no error in allowing Ronnie Coleman to testify at trial. First, after reviewing the trial transcript of Coleman's testimony, the Court finds that Coleman consistently stated that his testimony was based on his personal recollection of the Thomas interview. The witness did not read from notes as he testified on the stand, nor did he ever consult the notes during his testimony. Coleman did admit that prior to his testimony, he reviewed Capt. Fletcher's notes in order to verify the specific date, August 21, 1998, on which Coleman had interviewed Thomas. Furthermore, Defendant admitted that counsel had received the notes prior to the testimony, and Defendant had the opportunity to cross-examine Coleman. On cross-examination, Coleman confirmed that his testimony about Thomas's allegation was his

personal recollection and that the only information he gleaned from the notes was the date of his interview with Thomas.  It is clear then that except for the date of the interview, Coleman's testimony was not based on the notes.  Therefore, the Court finds no merit as to this objection.

Second, the Court holds that it was not error to permit Coleman to testify where the government had not disclosed Coleman or the substance of his testimony prior to trial.  The Court agrees with the government that there is no authority for such a requirement.  As previously noted, the notes which Coleman consulted to refresh his recollection only as to the date of the Thomas interview were produced by the government.  As a result, this objection is without merit as well.

Third, the Court holds that the probative value of Coleman's testimony outweighed any prejudice it may have caused Defendant.  Defendant argues that the Court should have excluded Coleman's testimony because he admitted that there was no subsequent investigation into Thomas' allegation, that Coleman did not have additional information on the allegation, and that Coleman had not located his tape recording of the Thomas interview.  Defendant adds that it is clear that Coleman's testimony was the "tipping point" for the jury.  Although Defendant has not specified, the Court interprets this assignment of error as to Coleman's testimony as an argument pursuant to Fed. R. Evid. 403.  The Court finds that Coleman's testimony was relevant and tended to show that it was more probable than not that Defendant had solicited Thomas and later Winberry to murder Martha Johnson.  Coleman corroborated Thomas' testimony that Defendant had solicited Thomas to commit a murder in exchange for a sum of money.  The fact that the Tipton County Sheriffs Department did not investigate further or that Coleman could not produce his tape recording of the Thomas interview were facts raised on cross-examination.  To

the extent that these facts may have damaged Coleman's credibility, the jury was free to accept or reject Coleman's testimony.  As a final matter, Coleman testified on March 24, 2009, the second day of a thirteen-day trial, and before Danny Winberry took the stand.  The Court is hard-pressed to see how Coleman's "inflammatory" testimony was the "tipping point" for the jury in this case.

Having considered Defendant's argument that the Court erred in allowing the testimony of Ronnie Coleman, Defendant's Motion is denied as to this assignment of error.


## VI.    *Failure to Grant Motion for Dismissal*

As his sixth assignment of error, Defendant only argues that "the Court erred in failing to grant his Motion for Dismissal and reserved the ruling until after trial."  The government has not responded to this objection.

Defendant made two separate Rule 29 motions before this case was sent to the jury: one at the close of the government's proof on April 8, 2009, and the second at the close of all the evidence on April 13, 2009.  As an initial matter, the Court reserved ruling on both motions and has not entered an order ruling on either of Defendant's Rule 29 motions.  Fed. R. Crim. P. 29 states in pertinent part as follows:

> (a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.  If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the

right to do so.

(b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.[33]

On April 15, 2008, the jury returned a verdict of guilty as to all counts. Therefore, both paragraph (a) and (b) of Rule 29 apply to Defendant's motions.

Considering only the evidence presented at the time the ruling on the initial Motion was reserved, the Court finds that the evidence presented during the government's case was not insufficient to sustain a conviction. The Court has discussed that evidence at length already in this Order. The same evidence taken together with the evidence presented by Defendant was, likewise, not insufficient to sustain the conviction. Therefore, Defendant's previous Rule 29 motions are denied, and Defendant's assignment of error is denied as to this issue.

## VII.    *Violations of Fifth and Sixth Amendments*

In his seventh assignment of error, Defendant contends that "the Government wholesale misrepresentations and fabrications during the case of defense witnesses' testimony denied the Defendant his right to a fair trial under the Fifth and Sixth Amendments." More specifically, the government misrepresented the testimony of Mrs. Vickie Johnson, Defendant's wife. The

---

[33] Fed. R. Crim. Pro. 29.

government called Eddie Kellum as a rebuttal witness to testify that Mrs. Johnson could not have purchased gas at his garage in April 2009 because his garage was no longer in business. According to Defendant, Mrs. Johnson did not testify that she purchased gas from Kellum in April 2009 but that she had purchased gas from him in the past.  Mrs. Johnson also testified that she had seen Kellum in town the day before.  The prosecution undermined Mrs. Johnson' credibility by making these misrepresentations to the jury.  Similarly, Defendant argues that the government mischaracterized the evidence by arguing in closing that Winberry had traveled to a casino on July 19, 1999.  Even though Defendant had offered evidence that Winberry was at home that day, the misrepresentation buttressed the prosecution theory that Defendant was urgently trying to contact Winberry the day before he left town for Arkansas.  Defendant further contends that he provided evidence that he had not called Winberry's residence from a pay phone at Jack's Garage at 8:44 p.m. and again at 9:15 p.m.  Without citation to any other authority, Defendant simply argues that these alleged misrepresentations violated his Fifth and Sixth Amendment rights.

In response the government argues that it did not misrepresent testimony offered by defense witnesses.  With respect to Mrs. Johnson, the government has cited her testimony on direct examination where counsel asks, "So it [Kellum's garage] is still in existence?" to which Mrs. Johnson answered in the affirmative.  The government points out that Mrs. Johnson's testimony was at odds with the earlier testimony of a government witness ATF Special Agent Mark Teufert who testified that Kellum's was no longer in existence.  On cross-examination, the government questioned Mrs. Johnson about photographs she had taken of the service station on April 8, 2009.  When asked if she had talked to Kellum himself at the service station that day,

34

Mrs. Johnson responded that Kellum was not in yet.  Mrs. Johnson went on to testify that she

had seen Kellum at the gas station on the day before she testified and that Kellum was still

operating the gas station.  In rebuttal, Kellum testified that he had closed the gas station in

October 2004.  Based on the testimony of Mrs. Johnson and Kellum, the government argues that

it was not a misrepresentation to point out a discrepancy in Mrs. Johnson's testimony.  With

respect to statements about Winberry's whereabouts on July 19, 1999, the government contends

that in its closing the prosecution simply stated that wherever Winberry was on that day, he was

not at home.

        The Court finds that this assignment of error is without merit.  The Sixth Circuit has held

that "[t]o warrant a new trial,. . . prosecutorial misconduct 'must be so pronounced and persistent

that it permeates the entire atmosphere of the trial.'  Furthermore, the prejudicial effect of

improper comment or questioning may be negated by curative instructions to the jury."[34]  The

Court finds that nothing in the statements cited by Defendant was improper much less a

misrepresentation.  Viewing the evidence in the light most favorable to the government, the

statements were not misrepresentations of the evidence or testimony at trial.  The Court finds

that a reasonable juror could have concluded from Mrs. Johnson's testimony that Kellum's gas

station was still in operation and that Mrs. Johnson had spoken to Kellum there in the days prior

to her testimony.  Mrs. Johnson made these assertions after a witness for the government had

stated that the gas station was no longer in business.  Thus, it was appropriate for the prosecution

to rebut Mrs. Johnson's testimony.  While the contested fact may not have been material to the

---

        [34] *Frost*, 914 F.2d at 768 (quoting *United States v. Thomas,* 728 F.2d 313, 320 (6th Cir. 1984)).

35

case, it did attack the credibility of the government witness.  As for the prosecution's comment about Winberry's whereabouts on July 19, 1999, the government only pointed out that there was disagreement over where Winberry was on that day.  The government's statements were supported in the record.  Therefore, the Court holds that Defendant's complaint of prosecutorial misconduct is unfounded.

## VIII.   *Insufficiency of the Evidence as to All Counts*

In his eighth assignment of error, Defendant makes the general argument that there was insufficient evidence to sustain his conviction as to all counts.  The Court has already considered the sufficiency of the evidence as to Count One, the conspiracy to commit murder-for-hire count, and Counts Two and Three, the murder-for-hire counts.  This leaves Counts Four through Eleven, the perjury counts.

The federal perjury statute makes it a crime "under oath in any proceeding before any court or grand jury of the United States [to make] any false material statement."[35]  To prove perjury in violation of 18 U.S.C. § 1623(a), the government must establish that (1) that Defendant gave testimony under oath before a federal grand jury; (2) that the Defendant testified as alleged; (3) this testimony was false; (4) that the Defendant knew that the testimony was false when he gave the testimony; and (5) that the false statement was material.

All of the perjury counts stem from Defendant's grand jury testimony on July 13, 2004.  Count Four of the indictment alleged that Defendant had committed perjury when Defendant was

---

[35] 18 U.S.C.A. § 1958(a).

36

asked whether he ever asked anyone to kill his mother.  Defendant answered that he had not.

The evidence at trial showed that Defendant had asked more than one individual including Lee

Thomas, Jeremy Lawrence, and finally Danny Winberry to murder his mother.

Count Five of the indictment alleged that Defendant had committed perjury during the

federal grand jury testimony when he denied that he had offered Lee Thomas $10,000 to kill his

mother.  However, Thomas testified at trial that Defendant had offered Thomas that sum in

exchange for the murder of Martha Johnson.  Thomas did not agree to Defendant's offer.

Ronnie Coleman, formerly of the Tipton County Sheriffs Department, testified that Thomas had

informed Coleman of Defendant's offer while Thomas was incarcerated.

Count Six of the indictment alleged that Defendant had committed perjury when he

denied that he had made a second proposition to Lee Thomas while the two men were putting up

fence.  Although Defendant denied that he had in testimony before the grand jury, the testimony

of Thomas and the evidence at trial showed that Defendant had in fact made a second offer to

Thomas.

Count Seven of the indictment alleged that Defendant had committed perjury when he

denied that he asked Jeremy Lawrence to murder Martha Johnson in exchange for money.

Defendant denied this under oath before the grand jury, yet the evidence at trial showed that

Defendant had made such an offer to Lawrence.  Lawrence testified that he was a friend of the

Defendant and that on one occasion, while the Defendant and Lawrence were riding in the

Defendant's pickup truck, Defendant offered Lawrence money to commit a murder.  Lawrence

asked Defendant who Defendant wanted murdered.  Defendant replied that "he would show me a

picture of it, of the person."  Lawrence also testified that he knew that the only photographs

37

Defendant kept in the truck were of his daughter Blaire, which was under the dash, and of his mother, which was above the sun visor.  Lawrence turned down the Defendant's offer.

Count Eight of the Indictment alleged that Defendant committed perjury when he denied that he offered Lawrence money in exchange for the murder of Martha Johnson.  Lawrence testified that Defendant offered him money to murder someone whom Defendant had a picture of in his truck.

Counts Nine, Ten, and Eleven of the Indictment alleged that Defendant committed perjury when he denied that he had discouraged Lisa Barnes from cooperating with investigators. Despite Defendant's denial, Barnes testified that Defendant had discouraged her from giving police information about a red pick-up truck, Winberry's truck, which Barnes had observed near Martha Johnson's trailer.  Barnes reported to Capt. Fletcher that she had seen a suspicious truck parked near Martha Johnson's trailer.  She described the truck as a small red pickup with chrome bars on the bed and gray stripes.  Several days after talking to Capt. Fletcher, Lisa Barnes was paying her rent to Defendant.  Barnes told Defendant that she was working with police to identify the person who had murdered Martha Johnson and had reported the suspicious red pickup.  According to Barnes, Defendant responded that "it would be best if I didn't go back and tell him anything else," and "not to go back or don't say anything when I went back."  Barnes was surprised by the Defendant's reaction to her comments and testified that she was left "in shock."

Viewing all of this evidence in the light most favorable to the government, the Court holds that the evidence was sufficient to allow any rational juror to find the essential elements of Counts Four through Eleven, all of the perjury counts, beyond a reasonable doubt.  The evidence

at trial showed that as to each count, Defendant had given the testimony under oath before the grand jury and that Defendant had testified as alleged in the indictment.  The government also proved that Defendant's testimony was false and material to the government's investigation of the crime.  Defendant knew that all of his alleged statements were false when he gave them because they related to events that occurred prior to his grand jury testimony.  Therefore, Defendant's Motion is denied as to this issue.

### IX.    *Length of the Trial*

In his ninth assignment of error, Defendant argues that the length of the trial prejudiced him and violated his Fifth and Sixth Amendment rights to due process and a fair trial.  According to Defendant, the jury was told that the trial would last seven to ten days; however, the trial took "nearly a month."  While Defendant grants that the continuances at trial were unavoidable, the Court erred by allowing the trial to continue for so long.  The government has responded that Defendant was informed of the reasons for the continuances in advance and did not object to delays until after the jury returned its verdict.  The first delay in this case lasted one week and was occasioned by a death in the family of lead counsel for the government.  Counsel for Defendant stated to the Court at that time that Defendant would not oppose any request that the government might make.  The government cites other instances when the Court dismissed the jury for the day at approximately 4:00 p.m. due to the threat of severe weather and another instance when Defendant requested an early adjournment for the day.

The Court holds that there was no error in permitting the trial to proceed in the manner it did.  In this case, voir dire commenced on March 23, 2009, and the jury returned its verdict on

April 15, 2009.  The proceedings themselves lasted for thirteen days which included parts of two days for the jury's deliberations.  Thus, the trial lasted three days longer than the Court had originally told the jury that it would.  When taking into account weekends and the continuance the Court granted early in the trial, the proceedings spanned twenty-four days, a little more than three and one-half weeks.  The Court granted a continuance of four days, the longest continuance during the trial, after a death in the family of lead counsel for the government.  At that time, the government sought a brief continuance to which Defendant agreed.  After the government informed Defendant of the reasons for the continuance, the Court questioned counsel for Defendant and then Defendant himself.  Both agreed that it was appropriate to grant a continuance and expressed no opposition to the Court.

Generally, a trial court is vested with wide discretion to grant a motion for continuance.[36] "Absent proof of a violation of a specific constitutional protection, a [defendant] must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process."[37]  A defendant must also establish that the trial court's ruling on a continuance resulted in actual prejudice to his defense.[38] The Court observes that these principles typically govern in cases where a defendant argues that the trial court erred by denying a defendant's motion for continuance.  In this instance, Defendant

---

[36] *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003) (citing *Ungar v. Sarafite,* 376 U.S. 575, 589-90, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)).

[37] *Powell*, 332 F.3d at 396 (citing *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir. 1988) (habeas petition under 28 U.S.C. § 2254)).

[38] *Powell*, 332 F.3d at 396 (citing *United States v. Moreno,* 933 F.2d 362, 372 (6th Cir. 1991)).

contends that the Court's decision to grant the government a continuance deprived Defendant of a fair trial. Defendant also argues that the trial was needlessly long due to other early adjournments of the trial. The only prejudice Defendant has cited was "loss of momentum." However, Defendant has failed to cite any specific authority for the proposition that a brief continuance at trial resulting in loss of momentum is so prejudicial that it constitutes a constitutional deprivation. Defendant has not explained what momentum was lost and how it deprived him of a fair trial. Additionally, the four-day continuance was granted early in the trial after the second day of testimony during the government's case-in-chief. If it could be said that any party lost momentum, the Court finds that it was the government. Therefore, the Court holds that this assignment of error is without merit.

## X.    *Jury Verdict Against Weight of Evidence*

In his tenth assignment of error, Defendant argues that the jury verdict "was against the great and overwhelming weight of the evidence" and that the Court should grant Defendant a new trial. The government has not responded to Defendant's argument as to this issue.

Fed. R. Crim. P. 33 provides, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[39] The Court should grant a Rule 33 motion only where the verdict was against the manifest weight of the evidence.[40] Not only are motions pursuant to Rule 33 distinct from Rule 29 motions, but Rule 33 motions for

---

[39] Fed. R. Crim. P. 33(a).

[40] *United States v. Turner,* 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd,* 633 F.2d 219 (6th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). *See also United States v. Mitchell*, 9 Fed. Appx. 485, 490 (6th Cir. 2001).

new trial are "disfavored, discretionary, and granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict."[41]  In this case, Defendant has not briefed the applicable Rule 33 standard.  Nevertheless, the Court interprets this assignment of error as a motion for new trial pursuant to Rule 33.  The Court holds that Defendant has failed to establish any "extraordinary circumstance" which might form the basis for granting a "disfavored" motion.  Therefore, Defendant's Motion is denied as to this issue.

## XI.    *Jury Instructions*

In his final assignment of error, Defendant argues that the Court erred in adopting jury instructions proposed by the government and rejecting the instructions proposed by Defendant. The Court's failed to instruct the jury on "the proper meaning of the terms used in the crimes charged in the indictment."  Defendant further objects to the Court's instruction on "false exculpatory statements."  The government has responded that Defendant has cited no new authority for this contention.  Rather Defendant simply reiterates his arguments raised at trial.

The Court finds no error in its jury instructions.  A court should review jury instructions "as a whole to determine if they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision."[42]  Where an instruction viewed as a whole is "confusing, misleading, and prejudicial," the Sixth Circuit will reverse a jury verdict.[43]  To the extent that Defendant did not object at trial and does not object to a

_____

[41] *Id.*

[42] *United States v. Carson*, 560 F.3d 566, 578 (6th Cir. 2009).

[43] *Id.* (citing *United States v. Blackwell,* 459 F.3d 739, 764 (6th Cir. 2006)).

specific instruction now, the Court finds no error in the jury instructions.[44]  In the Motion before the Court, Defendant has objected specifically only to the Court's instruction on "false exculpatory statements."[45]  Defendant argues without elaboration that this instruction was "harmful error."

The Court holds that the instruction was appropriate in this case.  First, this instruction is nearly identical to the instruction prescribed in O'Malley's *Federal Jury Practice and Instructions, Criminal*.[46]  The instruction includes cautionary language to ensure that the jury does not place undue weight on any exculpatory statement and considers reasons an innocent person might make a false exculpatory statement.  Second, the Court ruled previously that this instruction was consistent with the Sixth Circuit's Pattern Criminal Jury Instruction 7.14, which recognizes that false exculpatory statements might be evidence from which the jury may infer consciousness of guilt.  Defendant has cited no new authority that would lead the Court to reconsider its previous ruling on this instruction.  The proof at trial supported this instruction as well.  The evidence showed that Defendant had made repeated false statements to authorities and

---

[44] Upon review of the record, the Court finds that Defendant had also objected to two other instructions during the final jury charge conference at trial on April 13, 2009: the Court's instruction titled "Influencing Witnesses" (Jury Instructions, 7) and the instruction on the elements of the crime of conspiracy to commit murder-for-hire (*Id.* at 14).  With respect to the "Influencing Witnesses" instruction, the evidence at trial showed that Defendant had attempted to discourage Lisa Barnes from cooperating with the investigation into the murder of Martha Johnson.  Thus, this instruction was warranted.  As for the elements of the crime of conspiracy, Defendant argued at trial that an overt act was an essential element of the crime.  The Court considered this same argument and for the reasons previously set forth in this Order, Defendant's objection is overruled.

[45] Jury Instructions, 41.

[46] *See* Kevin F. O'Malley, Jay E. Grenig, & Hon. William C. Lee, *Federal Jury Practice and Instructions, Criminal*, §14.06.

43

others that he had no involvement in the murder of Martha Johnson.  Therefore, the instruction was proper and Defendant's Motion is denied as to this objection.

Defendant has further argued that the Court erred by refusing to deliver Defendant's proposed instructions.  The district court's refusal to deliver a defendant's proposed jury instruction must be reversed only if the instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense."[47] At the initial jury charge conference on April 9, 2009, Defendant raised six proposed instructions, four of which Defendant withdrew without argument based on his agreement with the instructions drafted by the Court.[48]  Thus, the Court holds that Defendant has waived any objections as to those four instructions.  The other two instructions proposed by Defendant at trial concerned the interstate activity element of the murder-for-hire instruction and the overt act requirement for the conspiracy instructions.  The Court has rejected Defendant's interpretation of the law as to both issues in this Order as well as in previous orders.[49]  Because the Court had rejected Defendant's interpretation of the law, Defendant's instructions were not accurate statements of the law.  There was no error in refusing to adopt Defendant's proposed instructions as to those two issues.  Therefore, Defendant's Motion is denied as to this objection.

---

[47] *United States v. Daniel,* 329 F.3d 480, 489 (6th Cir. 2003).

[48] Defendant withdrew without argument his proposed instructions on the elements of murder-for-hire (Trial Tr. 2097:17-22); the pecuniary value element of murder-for-hire (*Id*. at 2100:3-5); conspiracy (*Id*. at 2100:16-19); and reduced criminal liability (*Id*. at 2102:4-9).

[49] *See* Order Denying Defendant's Motion to Dismiss Count One of the Indictment, May 4, 2009; Order Denying Defendant's Motion to Dismiss Count Three of the Indictment, May 28, 2009.

## <u>CONCLUSION</u>

The Court concludes that all of the assignments of error in Defendant's Motion are without merit.  Therefore, Defendant's Motion for a Judgment of Acquittal Notwithstanding the Verdict or Alternatively for a New Trial is **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: August 6th, 2009.

45